UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

KAREEM MAYO,

Plaintiff,

v.

THE CITY OF NEW YORK, and
ANTHONY PITRE, in his individual and
official capacity,

Defendants.

**COMPLAINT**

Jury Trial Demanded

24-cv-6403

Plaintiff Kareem Mayo, by his attorneys the Law Office of Ronald L. Kuby, respectfully

alleges, upon information and belief, as follows:

## INTRODUCTION

The wrongful conviction of Kareem Mayo was manufactured by an over-zealous detective

who, lacking suspects in a murder case, quickly decided that Mr. Mayo was guilty of the killing.

This determination was based *exclusively* on information that Mr. Mayo was wanted by a different

precinct for a different violent crime (for which he was never indicted or tried). Having targeted

Mr. Mayo from the outset, the detective manufactured a case against him through the use of

improper, unlawful, and highly suggestive identification techniques to engineer an identification

from the survivor of the shooting. This single-witness identification of a stranger, made at a

distance at night under harrowing circumstances, was the sole evidence against Mr. Mayo at trial.

Despite learning that Mr. Mayo was in Virginia with his family at the time of the shooting, the

detective, and the assistant district attorney in charge of the case, brought the case to trial and

secured a conviction.

Mr. Mayo served twenty-three years in prison until his conviction was overturned, and

another five months on home arrest before the charges were dismissed.

1

The conviction of Mr. Mayo, and his co-defendant younger cousin Donnell Perkins, was undone when defense counsel obtained evidence unavailable to them at the time of trial, but available to the prosecution, that demonstrated that the eyewitness needed glasses for distance vision, that he perjured himself when he testified that he did not, and that he likely consumed much more alcohol (and likely marijuana) than he attested to. Because the entire conviction was based on the keystone of the witness' ability to see, reliability and truthfulness, the case collapsed, and the conviction was vacated and the indictment dismissed.

Although the fact-pattern of Mr. Mayo's wrongful conviction was unique, the circumstances surrounding it were part of a pattern and practice of police and prosecutorial misconduct countenanced by the City of New York that lasted for a generation and destroyed uncounted lives.

Mr. Mayo now brings this federal civil rights action, with pendent State tort claims, for violation of his federal and state constitutional rights, as well as state common law rights.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

1.     This action arises under 42 U.S.C. §§ 1983 and 1988, under the common law and Constitution of the State of New York, and the Constitution of the United States of America.

2.     The acts and omissions giving rise to this complaint occurred in Kings County.

3.     Plaintiff's damages exceed $25,000.

4.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 and under the principles of pendent jurisdiction.

5.     Venue is proper under 28 U.S.C. § 1391.

6.     This action has been commenced within the applicable period for each claim.

7.     Plaintiff has duly complied with all conditions precedent to the commencement of this action.

## THE PARTIES

8.     Plaintiff Kareem Mayo is a citizen and resident of the State of New York and of the United States. He resides within the Eastern District of New York.

9.     Defendant ANTHONY PITRE, Shield No. 3417, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

10.     Defendant CITY OF NEW YORK is a municipal corporation of the State of New York and is a resident of the Eastern District of New York.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

11.     On December 25, 1999, just after 4:00 a.m., Ernest Brown called 911 and reported that someone in a *gray* Infiniti Q45 had shot his friend Reuben Scrubb at a gas station in Brooklyn, New York. Scrubb was pronounced dead shortly after. In two interviews within two days of the shooting, Brown, the sole eyewitness, told police the following details.

12.     Before 4:00 a.m. on December 25, Brown and Scrubb had left a Brooklyn bar called Po'k Knockers. As they stood on the sidewalk, a man came out of the bar and bumped into Scrubb. After Scrubb and the man exchanged words, the man crossed the street and got into a waiting car. Scrubb and Brown then walked in the same direction as the man, toward a gas station located on the other side of the street.

13.     When Brown and Scrubb were at the gas station, a gray Infiniti Q45 pulled up. Sitting in the passenger seat was the man who had exited Po'k Knockers and bumped Scrubb (the "bumper-passenger"). He and the driver (the "driver-shooter") began arguing with Scrubb. The driver-

shooter repeatedly said, "Should I pop him?" The car pulled away but then immediately backed up, and the driver-shooter fired a gun. Scrubb was killed. Brown was unhurt.

*14.* Having told the 911 dispatcher that the perpetrators' Q45 was gray, he described it to police as "gray or gray/beige a crazy color," or "either a dark gray or like a cream color."

15. Brown described the bumper-passenger as a Black male with dark skin, 18-23 years old, 6'1" to 6'3" in height, with a clean-shaven face, eyeglasses, and hair styled in "corn braids."

16. Brown's initial description of the driver-shooter was Black male with light to medium skin, a medium build, and a light beard, aged 20-30 years old.

17. During a second police interview, Brown's description of the driver-shooter shifted, dropped some details and added others: Medium build, low haircut, light beard, 26-30 years old.

18. These highly generic, vague, and changing descriptions matched many, if not most of the tens of thousands of young Black men in New York City alone.

19. Two days after the shooting, the lead detective Anthony Pitre, had no leads. He requested a "lawman search" from the NYPD Auto Crime Division for a listing of Infiniti Q45s in Kings County that were **gray**, **white**, or **cream** in color. The search produced hundreds of results. By his own admission, Detective Pitre did not do "anything" with any of this information.

20. Just a few hours later, on December 28 at 3:30 a.m., a patrol officer stopped an Infiniti Q45, allegedly for an illegal lane change, and identified one of the occupants as Maurice Mayo of 67 Stuyvesant Ave. in Brooklyn. This Q45 was **gold**—matching none of the colors Brown had used to describe the perpetrators' Q45. However, from this point on in Pitre's investigation, he began to focus exclusively on members of the Mayo family, and in, particular on Kareem Mayo.

21. Mr. Mayo was involved in selling crack cocaine. Indeed, at the time, Mr. Mayo was an active member of the Mayo family drug-selling operation and was thus a regular target of

retaliation by law enforcement, specifically the 81st Precinct. He had been arrested by the 81st Precinct three times for crimes he did not commit —a murder, for which he was acquitted, and two serious assaults which were ultimately dismissed. He was a man that the police were working very hard to remove from the streets.

22.    Of course, it did not all fit together. Mr. Mayo had only a single, unclassified misdemeanor conviction for a traffic offense. Moreover, this appeared to be a murder that grew out of a fight outside a bar on early Christmas morning—there was never any allegation that either the Scrubb or Brown were involved in drug-dealing. And the efforts by the 81st precinct to tie Mr. Mayo to violent offenses had all failed.

23.    More important, when Reuben Scrubb was shot and killed in a drive-by shooting early on Christmas Day 1999, Mr. Mayo was hundreds of miles away, in Richmond, Virginia. He had intentionally left New York for Christmas. When Mr. Mayo found out just before Christmas in 1999 that he was wanted by the same precinct for yet another, fourth crime he did not commit — this time, an attempted murder — he left New York, for his cousin's home in Richmond, VA, to spend Christmas with his children, and his money on presents, not bail.

24.    Kareem Mayo's only connection to the gold Q45 was that he was Maurice's nephew. Nevertheless, Pitre later admitted that he began to focus on Kareem Mayo simply because he was a member of the Mayo family and was wanted in the other case.

### A.  <u>Identification Procedures</u>

25.    On the night of December 30, 1999, Pitre picked up Brown and took him to 67 Stuyvesant Street. Maurice Mayo's gold Infinity Q45 was parked across the street from the house, in plain view. Another Infinity Q45, a white one, belonging to Donnell Perkins, was behind it. Pitre then asked Brown to see if there are any cars fitting the description from the shooting." As the result of

this highly suggestive and wildly improper show-up procedure, Brown told Pitre that the gold car looked like the perpetrators' car.

26. Pitre and Brown remained outside the residence for some period of time, with Pitre instructing Brown to see if anyone who went in or came out looked like the perpetrators.

27. The car did not match the description given by Brown and it would be unlikely that someone who just used that vehicle in a murder would park it in plain view, on the street, without any attempt to alter its appearance.

28. Having coached Brown to select a car belonging to the Mayo family, Detective Pitre immediately showed Brown a photo array containing Kareem Mayo's photo and coached him into selecting Mr. Mayo as the driver-shooter.

29. Pitre falsely claimed in a DD5 that he prepared a photo array containing Kareem Mayo's photo. In reality, he had simply obtained a photo array that detectives from the 81st precinct already had prepared in connection with the shooting in the neighboring precinct. That suggestive photo array had been previously used to secure unfounded charge(s) against Mr. Mayo.

30. Despite Brown's insistence in his first statement after the shooting that the shooter had light to medium skin tone, three of the six fillers were dark-skinned.

31. Mr. Mayo had just turned twenty-five earlier that month. Brown's second statement, that the shooter was between 26 and 30, should have precluded Mr. Mayo's photograph from being placed in the array in the first place.

32. Indeed, the science of eyewitness identification, instrumental in helping to overturn this wrongful conviction, teaches that it would have been extremely unlikely for Brown to make an accurate identification of anyone, without assistance from Detective Pitre. More specifically, Brown's encounter with the driver-shooter was extremely short, and Brown had part of his

attention focused on the bumper-passenger, and another focus on the firearm. While there was overhead lighting at the gas station, the roof of the car was between the light source and driver. Brown's observations took place under the most stressful imaginable circumstances—watching his friend get shot and believing that he might be a target.

33.     There were also circumstances unique to Brown that made an accurate identification virtually impossible. He had been drinking, likely smoking marijuana, had been awake for an extended period of time, and of course, was not wearing the glasses he needed for distance vision.

34.     As a result, the descriptions he gave of the driver-shooter were vague, shifting, and inconsistent with each other.

35.     At that point, Pitre testified that he now had probable cause to make an arrest of Kareem Mayo and began to search for him.

36.     During the next week, Pitre and other officers focused on Donnell Perkins, Kareem Mayo's much younger cousin. They stopped his car and pressured him, unsuccessfully, to reveal the whereabouts of his cousin Kareem. On January 6, 2000, Pitre again pulled over Perkins. At the precinct, Pitre and other detectives again asked Perkins to tell them where Mayo was. When Perkins told them he didn't know, Pitre threatened Perkins that he would put him in a lineup, where he would be pointed out. Perkins still did not give the detectives any information.

37.     As Pitre had warned Perkins, he proceeded to manufacture Ernest Brown's false lineup identification of Perkins and arrested him for murder.

38.     Kareem Mayo, who was out of New York visiting family when Scrubb was shot, was arrested on January 28, 2000, after he returned.

39.     He was then placed in a line-up, again by Detective Pitre. Pitre failed to properly photograph the line-up in a manner that would permit informed review as to suggestibility, despite

his duty to do exactly that. After the line-up, he was informed that he had picked the correct subject, improperly reinforcing a false identification.

### B.  <u>The Prosecution</u>

40.    Notwithstanding the lack of probable cause to believe that Mayo and Perkins had participated in the crime, Pitre filed a false Criminal Court complaint initiating a murder prosecution of both. Pitre then failed to inform either the KCDAO or the grand jury of the above circumstances, which showed how he had manufactured the case and that there was no probable cause. As a result of this deception, the D.A.'s Office presented the case to a grand jury, the grand jury voted an indictment, Mr. Mayo was held in pretrial detention, he was tried and convicted of the murder in April 2001, and he ultimately was sentenced to 25 years to life in prison.

41.    The entire case consisted of Ernest Brown's manufactured identification testimony, bolstered by Pitre's own testimony.

### C.  <u>The Exoneration</u>

42.    On January 23, 2023, the State Supreme Court, Kings County, granted Mayo and Perkins' CPL § 440.10 motion based on newly discovered evidence that Ernest Brown, who wasn't wearing eyeglasses when the shooting occurred, had significantly impaired eyesight at the time and had testified falsely about his eyesight at trial. Five months later, on June 16, 2023, on the District Attorney's motion, the court dismissed the indictment.

43.    Before the favorable termination of his prosecution, Kareem Mayo spent 23 years and 3 days in jail or prison, and an additional 5 months and 16 days on home detention with an ankle monitor.

### D.  **Misconduct by NYPD Police Officers**

44.      The above-detailed misconduct by employees of the NYPD and the KCDAO caused the initiation and continuation of Mayo's prosecution without probable cause; his wrongful prosecution and conviction based upon the manufacturing and use of false evidence, the withholding of exculpatory and impeaching evidence, and other misconduct that denied Mayo a fair trial in violation of the Constitutions and the laws of the United States and the State of New York; and Mayo's resulting damages.

45.   This misconduct resulted from the continuing negligence, recklessness, and/or deliberate indifference—before and during the investigation and prosecution of Mayo, and through the date of his exoneration—by the Police Commissioner of the City of New York and by his designates, with regard to the hiring, retention, training, supervision, and disciplining of prosecutors and police officers, despite repeated notice of their failures to comply with their obligations to investigate, arrest, initiate, and continue the prosecution of criminal suspects or defendants in accordance with the common law, the statutes, and the Constitutions of the United States and the State of New York, including the requirement of probable cause as a predicate for an arrest and a prosecution; the obligation not to manufacture false evidence through coercion, suggestion, or other improper means; and the obligation to fully disclose evidence favorable to the suspect or defendant.

46.   The City also is liable for the torts of its employees under the principle of *respondeat superior*.

### FIRST CAUSE OF ACTION: Malicious prosecution under New York state law. Detective Pitre and the City of New York.

47.   Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

48. Detective Pitre, acting individually and in concert with others, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Mr. Mayo.

49. He did so without probable cause and intentionally caused Mr. Mayo to be deprived of his liberty.

50. The proceedings terminated in Mr. Mayo's favor.

51. Defendant City of New York is liable for Mayo's prosecution and damages under the principle of *respondeat superior*.

## SECOND CAUSE OF ACTION: 42 U.S.C. § 1983. Malicious prosecution in violation of the Fourth, Fifth, and Fourteenth Amendments. Detective Pitre.

52. Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

53. Defendant Pitre is liable for his violation of Mayo's constitutional rights, and all of his resulting damages, in accordance with 42 U.S.C. § 1983 and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

## THIRD CAUSE OF ACTION: 42 U.S.C. § 1983. Evidence fabrication in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments. Detective Pitre.

54. Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

55. Detective Pitre, acting individually and/or in concert with others, acted deliberately, willfully, recklessly, and/or with deliberate indifference to the truth, to fabricate or manufacture

false or patently unreliable witness statements and false or materially misleading documentary evidence implicating Mr. Mayo in the crime.

56.     The evidence they fabricated or manufactured includes but is not limited to:

   a.   Ernest Brown's statement during the police investigation that the gold Q45 registered to Maurice Mayo resembled the car driven by the perpetrators;

   b.   Brown's testimony during trial that the gold Q45 Maurice Mayo *was* the car driven by the perpetrators;

   c.   The photo array falsely purporting to document that Ernest Brown had identified Mr. Mayo in the array;

57.     Detective Pitre forwarded or caused the forwarding of such fabricated or manufactured evidence to prosecutors for use against Perkins during a criminal prosecution.

58.     Detective Pitre knew the fabricated or manufactured evidence would be likely to influence a jury's decision at trial.

59.     As a result of the Detective Pitre's forwarding of the fabricated or manufactured evidence to KCDA prosecutors, the latter initiated a criminal prosecution of Mr. Mayo and he lost his liberty.

60.     Detective Pitre's misconduct violated Mr. Mayo's right to be free from unreasonable seizure, as guaranteed by the Fourth Amendment to the United States Constitution, and his rights to procedural and substantive due process and a fair trial, as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

61.     As a result of the Detective Pitre's conduct and/or failure to intervene, Mr. Mayo's liberty was infringed or curtailed, in violation of his Fourth, Fifth, Sixth and Fourteenth Amendment rights.

62.     The above misconduct was outrageous and shocking to the conscience.

**FOURTH CAUSE OF ACTION: 42 U.S.C. § 1983 and *Monell*. Municipal liability for the conduct of employees of the NYPD. Defendant City of New York.**

63.     Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

64.     The Police Commissioner and police officers employed by the NYPD are agents and employees of Defendant City of New York.

65.     Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner or his authorized delegates, during all times relevant to this Complaint, had final responsibility for training, instructing, supervising, and disciplining police officers and other employees of the NYPD with respect to the investigation and prosecution of criminal matters.

66.     The particular areas in which the Police Commissioner or his authorized delegates were responsible for training, instructing, supervising, and disciplining police officers and other employees of the NYPD included but were not limited to:

   a.   the constitutional obligation, pursuant to the Fourth, Fifth, and Fourteenth Amendments to the Constitution, not to initiate or continue a prosecution, and to cause a criminal defendant's deprivation of liberty, without probable cause;

   b.   the constitutional obligation, pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments, not to fabricate or manufacture evidence, including false or unreliable identifications and false or materially misleading or incomplete reports, for use against criminal suspects and defendants in criminal prosecutions and trials;

   c.   the constitutional obligation not to give false or misleading testimony.

67.     During all times material to this complaint, the City, through its policymaking officials in the NYPD, owed a duty to the public at large and to Plaintiff to implement policies, procedures,

customs, and practices sufficient to prevent, deter, and avoid conduct by NYPD employees that would result in the violation of the above-mentioned constitutional obligations.

68.     These policymakers knowingly and intentionally breached, or were deliberately indifferent to, this duty.

69.     Furthermore, these policymakers created substantial incentives for their employees to commit the above-described constitutional violations, by pressuring police officers to close cases through arrests, indictments, and convictions.

70.     The aforesaid deliberate or de facto policies, procedures, regulations, practices, and/or customs (including the failure to properly instruct, train, supervise, and/or discipline employees) were implemented or tolerated by policymaking officials for Defendant City—including but not limited to the Police Commissioner—who knew, or should have known:

   a. to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation of criminal cases;

   b. that such issues present NYPD employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

   c. that NYPD employees facing such issues have strong incentives to make the wrong choices, especially given the pressure placed on NYPD employees to make arrests, close cases, and secure indictments and convictions;

   d. that NYPD employees had a history of making wrong choices in such matters; and

   e. that the wrong choice by NYPD employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused person and cause him constitutional injury.

71. At the time of Plaintiff's arrest and prosecution, NYPD policymaking officials were on notice of the risk of misconduct by NYPD employees that would violate the constitutional obligations identified above, based on the following circumstances, among others:

a. credible allegations, many substantiated by judicial decisions, that NYPD detectives had wrongfully withheld material evidence; manufactured false or unreliable identification evidence and other evidence; and/or knowingly given false or misleading testimony;

b. civil lawsuits, some of which resulted in substantial civil settlements, credibly alleging that NYPD detectives had falsified, exaggerated, or withheld material evidence, or conducted searches or made arrests without probable cause;

c. numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division discussing the difficult issues that regularly arise for police officers under *Brady*, during eyewitness-identification procedures, and in other phases of criminal investigations;

d. judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their *Brady* obligations and for failing to adopt adequate *Brady* disclosure policies, *see, e.g.*, *Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985) (McLaughlin, J., adopting the Report and Recommendation of then–M.J. Scheindlin), and putting the NYPD on notice that the City could be held liable for its failure to adequately train police officers regarding their obligations to provide truthful testimony and to disclose evidence that favors criminal defendants under

*Brady*, *see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Carter*, 612 F. Supp 749;

e.  formal reports of the New York City Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the New York City Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action;

f.  the 1994 Mollen Commission Report, based on a two-year investigation and a year of hearings, finding a "culture of corruption" in the NYPD, pervasive misconduct by NYPD officers and detectives including the fabrication of evidence and testimony, and tolerance of this culture and misconduct by the NYPD's leaders; and

g.  the inherent obviousness of the need to train, supervise, and discipline police officers in such obligations to counteract the pressure on officers to close cases and to obtain arrests and convictions.

72.  Many of the aforementioned unlawful practices, their toleration by police policymakers, and the culture of corruption that ensued, were documented before the prosecution and conviction of Mr. Mayo, in the aforementioned Mollen Commission Report.[1]

73.  The Mollen Commission was formed in 1992 after widespread reports of police corruption, including, among other things, the fabricating of evidence in criminal investigations.

74.  The Mollen Commission "interviewed scores of former and current police officers and supervisors." Mollen Commission Report at 36. It found that

---

[1] City of New York, Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department, *Commission Report*, July 7, 1994, https://ia902701.us.archive.org/20/items /MollenCommissionNYPD/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[o]fficers . . . commit falsification to serve what they perceive to be "legitimate" law enforcement ends—and for ends that many honest and corrupt officers alike stubbornly defend as correct. In their view, regardless of the legality of the arrest, the defendant is in fact guilty and ought to be arrested. Officers reported a litany of manufactured tales.. . . Frustrated by what they perceive to be unrealistic rules of law and by their own inability to stem the crime in their precincts through legal means, officers take the law into their own hands. And police falsification is the result.

[*Id.* at 38.]

75.     The report noted: "Several officers . . . told us that the practice of police falsification . . . is so common in certain precincts that it has spawned its own word: 'testilying.'" *Id.* at 36.

76.     In one NYPD unit, the Commission found that "the unit's commanding officer not only tolerated, but encouraged, th[e] unlawful practice" of "falsif[ying] documents" and "committ[ing] testimonial perjury." *Id.* at 39.

77.     The Commission concluded that there existed

a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful. . . . This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."

[*Id.* at 41.]

78.     The Commission also noted that

the Department's top commanders must share the blame. . . . We are not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch.

Nor do we know of a single, self-initiated Internal Affairs Division investigation into patterns of police perjury and falsification. . . . Internal Affairs over the last decade had no record of the number of falsification allegations brought against officers throughout the Department or in a particular precinct or command. There is no evidence that anyone in the Department's chain of command had focused on eliminating this practice, including past Police Commissioners and Internal Affairs

chiefs, who apparently turned a blind eye to unlawful practices that were purportedly committed to fight crime and increase arrest statistics.

[*Id.* at 41-42 (emphasis added).]

79.    Despite the revelations of the Mollen Commission Report, the types of constitutional violations documented in the report persisted in the following years, with little to no effort by NYPD policymaking officials to address them.

80.    Two detectives whose repeated misconduct NYPD policymaking officials repeatedly turned a blind eye to were Louis Scarcella and Stephen Chmil.

81.    In 1988, in the murder prosecution of James Jenkins, Brooklyn Supreme Court Justice Francis X. Egitto found, after a hearing, that the "pretrial identification procedures employed by [Scarcella] were unduly suggestive and prejudicial to defendant."

82.    The decision detailed how Scarcella, in violation of police practice and constitutional requirements, had shown a single photo of Jenkins to two witnesses instead of a photo array.

83.    It also detailed how, upon Jenkins's arrest, Scarcella had brought five witnesses to the precinct and conducted the following improper identification procedure:

The witnesses were not separated prior to viewing defendant. Indeed, they were individually and collectively told by Detective Scarcella that "we arrested the man we believe was responsible for the death of the deceased; I would like you to take a look at him." After each witness individually viewed the defendant through a two-way mirror, that witness was returned to the room where his fellow witnesses waited. No effort was made to keep the witnesses from discussing their viewing of defendant who was observed, alone, in a room.

84.    The court concluded:

85.    "The practices here utilized represent a classic illustration of what not to do in conducting pretrial identification procedures. It was unnecessary to display to the witnesses a single photo; no exigent circumstances justified a showup; and no argument can be advanced to support Detective Scarcella's telling the witnesses that the police had "arrested the man we believe was responsible

for the death of the deceased." Based upon this abysmal showing, and the Police's patent disregard for accepted identification procedures, the court is left no choice but to exclude from trial all mention of such practices [emphasis added]."

86.     Notwithstanding Justice Egitto's harsh criticism, the NYPD conducted no investigation of Scarcella and took no disciplinary action against him.

87.     In 1990, David Ranta was charged with murder in the high-profile shooting death of a beloved Orthodox rabbi earlier that year.

88.     Scarcella and his frequent partner Chmil were assigned to investigate the killing.

89.     At a pretrial hearing, Scarcella testified that several months after the shooting, he spoke to a man named Alan Bloom, who had been arrested near the shooting location.

90.     Bloom was facing numerous robbery charges and many years in prison and was incarcerated at Rikers Island.

91.     Scarcella testified that Bloom had implicated men by the names of David and Steve but did not give last names.

92.     Scarcella testified that he then located photos of David Ranta and Steve Sicar, placed them in a photo array or photo arrays, and showed them to Bloom, who identified both men as having participated in the shooting.

93.     At the hearing, Justice Egitto expressed his incredulity:

94.     "I'm still interested when a person gets arrested, when we have a police officer who tells us the name Steve comes up and he goes ahead to the Catch Unit and picks out a picture of Ranta and Steve when nobody told him Steve's last name. I don't know if he's a medium of some kind. He also picked out the name of Ranta before anyone told him Ranta's last name. From what I

gather he heard the name David. Lo[] and behold they are the right people. It stretches the credulity of the court in how these pictures are obtained."

95. Scarcella and Chmil also manufactured at least one lineup identification of Ranta by blatantly suggesting to a witness whom he should pick.

96. When an audio recording of the lineup came to light at trial, the defense alleged on the record that the recording established the detectives' misconduct during the lineup.

97. Justice Egitto again admonished Scarcella, and now Chmil too, on the record:

98. The more I hear this the more I am disillusioned with the work of the detectives. Here a young man of 14, 15 years of age says specifically I think it is number three. The cop, probably Scarcella or Chmil, says, okay, number three. From there on in the kid goes along with the number three . . . . He said, I think it is number three, which is not identifying any one [emphasis added]. This witness later revealed that a detective had told him to "pick the guy with the big nose."

99. Justice Egitto made the following additional remarks about Scarcella's and Chmil's conduct during the Ranta investigation:

> I think what they have done in this case, in my opinion, is decide that Mr. Ranta was the person, the guilty party, and then they went out of their way to make sure it tied up neatly in a package.. . . [T]hey decide the case and that is the reason why a lot of our cases are being blown out when the People only have the police officers to rely upon for their statements, such as narcotics cases and gun cases. The detectives have to be taught here in New York State, unlike a lot of other places, we have a constitution. And they have to live up to it. . . . I think it is ridiculous the way cops take it upon themselves to be judge, jury, and partial executioner.. . . .I tell you this. In my opinion throughout this case the two detectives did all they could to tie it up in a neat package. . . . I don't think what they did and the manner in which they did it was, shall we say, absolutely fair.

As a result of Scarcella's and Chmil's misconduct, Ranta was convicted.

100. Despite Justice Egitto's comments, the NYPD conducted no meaningful investigation of their misconduct and took no meaningful action to discipline them.

101. As a result, Ranta remained in prison until the Kings County District Attorney's Office ("KCDAO") itself finally moved to vacate Ranta's conviction in 2013, after the *New York Times* exposed the misconduct of Scarcella and Chmil in numerous cases, including the Ranta case.

102. NYPD policymakers also knew or should have known that in six different homicide prosecutions, Scarcella had used the false and inherently unbelievable "eyewitness" identifications of suspects by a single witness, Teresa Gomez, who was addicted to crack cocaine and engaged in prostitution.

103. In these and numerous other cases, Scarcella and Chmil pressured people addicted to drugs, who were highly susceptible to police pressure, to provide false evidence, or the detectives used unlawful means to coerce or fabricate confessions and false identification evidence.

104. As a results of Scarcella's and Chmil's misconduct, numerous people were wrongfully convicted; many of them did not see their convictions vacated until decades later and some of them still sit in prison as a result of these detectives' misconduct.

105. Scarcella was open about his attitude, saying: "Are there rules when it comes to homicide? No. No, there are none. I lie to them. I will use deception. The bad guys don't play by the rules when they kill Ma and Pop, shoot them in the head, ruin the lives of their family. I don't play by the rules."

106. One judge stated in overturning a conviction that Scarcella secured through his misconduct:

> The findings of this court are that the assigned Detective, Louis Scarcella, was at the time of the investigation [in 1991] engaged in false and misleading practices. The cases of David Ranta, Derrick Hamilton, Robert Hill, Alvena Jennette and Darryl Austin that were investigated by Scarcella and prosecuted contemporaneously with this case in the early nineties demonstrate this pattern and practice. The pattern and practice of Scarcella's conduct which manifest a disregard for rules, law and the truth undermines our judicial system and gives cause for a new review of the evidence.

[*People v. Hargrove*, 49 Misc.3d 1208(A), at \*8 (N.Y. Sup. Ct. Kings Cty. 2015) (emphasis added), *aff'd*, 162 A.D.3d 25 (2d Dep't 2018).]

107. After the *Hargrove* decision was issued in 2015, several more cases involving Scarcella were overturned based on his involvement in the police investigations.

108. Based on the pervasive misconduct by Scarcella and Chmil in the above cases, and others, NYPD policymaking officials knew or should have known that the detectives were coercing confessions, manufacturing false or unreliable identification evidence, intentionally securing testimony that they knew to be false, giving false testimony themselves, and suppressing evidence favorable to criminal defendants which they knew they were obligated to disclose.

109. Yet these policymaking officials failed to take meaningful steps to supervise or discipline Scarcella or Chmil to ensure that such misconduct did not continue.

110. Instead, the NYPD treated Scarcella and Chmil as heroes for obtaining arrests and convictions at a blistering rate, thus sending a clear message to the entire NYPD police force that such misconduct would be not just tolerated but celebrated.

111. Another of the many homicide detectives who engaged in repeated misconduct to which NYPD policymakers were deliberately indifferent was Michael Race.

112. Race admitted that he investigated 750 murder cases but only one was "done the correct way, from A to Z."

113. An NYPD colleague testified that Race

114. had a reputation among detectives for feeding informants and witnesses details about crimes [and] that Race had a reputation of referring informants and witnesses to the TIPS hotline so they could collect rewards for information, which is a violation of police procedure because of the risk of kickbacks.

[*Blake v. Race*, 487 F. Supp. 2d 187, 204 (E.D.N.Y. 2007).]

115.    In the early 1990s, Race fed details to an informant, Dana Garner, and caused Garner to provide false statements and testimony leading to the arrests and prosecutions of Jeffrey Blake, Ruben Ortega, and Timothy Crosby.

116.    As a result of Garner's testimony, Blake was convicted of murder and sentenced to 36 years to life in prison, Ortega was convicted of murder and sentenced to 25 years to life in prison, and Crosby was convicted of felony assault and sentenced to 10 years to life in prison.

117.    In 1998, the KCDAO conceded that Garner was an unreliable witness and consented to the vacatur of Blake's conviction.

118.    In 1999, Garner signed a sworn statement recanting his accusations against Ortega and Crosby.

119.    That same year, a state judge vacated Crosby's conviction after finding Garner to be "a completely unreliable witness."

120.    In 2003, the Second Circuit vacated Ortega's conviction based on the unreliability of Garner's testimony.

121.    During civil litigation after Blake's conviction was vacated, Garner testified that Race had fed him the details that he provided in his statements to law enforcement and his eventual testimony in the Blake and Ortega cases, and that Race had threatened to charge him with crimes if he didn't implicate Blake and Ortega.

122.    Garner further testified that, during a lineup in the Blake case, a detective (he claimed he could not remember which one but knew that Race was at least present at the lineup) had told him to "just point out Jeffrey Blake." When Garner hesitated, the detective said, "I know you see him, just go ahead and point him out," and claimed Garner was "looking in [Blake's] direction . . . leaning in his direction."

123.     Despite Garner's evident unreliability as a witness and Race's reputation among his NYPD colleagues for feeding witnesses details about crimes, NYPD policymaking officials made no meaningful efforts to scrutinize Race's conduct in these investigations.

124.     Another case that illustrates the pattern of misconduct to which NYPD policymaking officials were deliberately indifferent is that of Zaher Zahrey.

125.     From 1994 to 1996, various senior detectives from the NYPD's Internal Affairs Bureau ("IAB") tried to frame Zahrey, an NYPD detective whom they suspected of being corrupt, for drug-related crimes including murder.

126.     The initially-assigned detective, Sgt. Robert Boyce, tape-recorded himself encouraging a state prisoner, Sidney Quick—whom Boyce knew to be serial robber and murderer addicted to crack—to adopt a false story that Boyce suggested to him implicating Zahrey in a series of murders, robberies, and drug deals.

127.     Boyce knew the story was false because it contradicted Quick's prior statements as well as independent police investigation.

128.     Boyce improperly promised to give Quick a "very, very, very sweet deal" and to "drive [Quick] home" if, contrary to Quick's prior statements, he'd "nail [Zahrey] to a cross" by accusing Zahrey of being present for and participating in these crimes.

129.     Later, when other IAB detectives could not corroborate Quick's manufactured claims, they convinced the United States Attorney's Office in Brooklyn to take over the case by concealing from that office the Quick audio recording.

130.     While Quick was refusing to cooperate with the federal authorities, the assigned IAB detective worked with a prosecutor from the KCDAO, Teresa Corrigan, to use secret coercion and under-the-table promises to induce Quick into agreeing to testify.

131.    Zahrey ultimately was acquitted after Boyce's investigative misconduct was exposed, but not until Zahrey had spent nearly nine months in jail on the false charges.

132.    Zahrey also was acquitted by an NYPD administrative judge who found that Boyce had led Quick to manufacture false allegations, a finding that was ratified by the Police Commissioner.

133.    This finding did not stop the NYPD from continually promoting Boyce and eventually making him Chief of Detectives for the entire department.

134.    None of the other IAB personnel involved in the Zahrey case were disciplined either; instead, most were promoted.

135.    NYPD detectives also committed misconduct to obtain a corrupt murder conviction in 1995 in the Jabbar Collins case.

136.    Brooklyn detectives suspected Collins of having committed the botched robbery-murder of an Orthodox rabbi in 1994 in Williamsburg.

137.    The assigned homicide detective, Vincent Gerecitano, refused to accept the statements of a witness, Edwin Oliva—who was addicted and heroin and had just been arrested for an unrelated robbery in the same building where the rabbi's murder occurred—that he didn't know anything about the murder in question.

138.    Gerecitano detained Oliva, who was addicted to heroin, while he was going through withdrawal and was drooling, crying, exhausted, and desperate.

139.    Gerecitano coerced Oliva into signing a sworn written statement implicating Collins by refusing to summon medical assistance for Oliva while simultaneously promising Olive that he would assist him in obtaining leniency from the KCDAO.

140.    Gerecitano omitted all these circumstances from his written police reports and never disclosed them to prosecutors.

141.    Later, before trial, Oliva recanted his coerced written statement, but prosecutors, evidently unaware of how Gerecitano had coerced Oliva's original sworn written statement, brought in Gerecitano to pressure Oliva to recant his recantation.

142.    Ultimately, in 2010, after Collins had spent 16 years in prison, prosecutors revealed Oliva's recantation, a federal judge ordered Collins released, and all charges were dismissed.

143.    At the time of Plaintiff's prosecution, NYPD policymaking officials were on notice of numerous instances, in addition to many of those discussed above, in which detectives improperly manufactured false or unreliable identifications in serious felony cases.

144.    After the arrest of Kareem Bellamy in 1994 for a stabbing death, NYPD Detective John Gillen conducted a lineup that included Bellamy.

145.    The only known eyewitness could not positively identify Bellamy.

146.    The detective took the witness into a private room for an improper private meeting, after which the witness suddenly claimed to be certain that Bellamy was the perpetrator.

147.    The witness's identification of Bellamy was a significant cause of Bellamy's conviction at trial.

148.    Bellamy was imprisoned for 14 years before his conviction was overturned and the charges against him dismissed.

149.    In 1996, the same Detective Gillen conducted a lineup in the investigation of Emmett Wheaton for a robbery.

150.    At the lineup, Wheaton heard Gillen saying to the witness, "Is it number four? Is it number four? Is it number four?"

151.    The witness picked out number four, Wheaton, and Wheaton was arrested and charged.

152.    Wheaton was acquitted at trial, but only after spending almost a year in jail.

153.    In 1999, NYPD detectives brought Jason Chambers, who had witnessed a murder, to view a lineup containing suspect Pierre Jenkins. Chambers picked Jenkins.

154.    The next year at a pretrial hearing, Chambers testified that he had picked Jenkins only after the detectives had told him: "you got to pick somebody. It was like, you got to get him. Pick somebody."

155.    Chambers then recanted his identification of Jenkins.

156.    Asked why he had picked Jenkins originally, Chambers said: "Because the detectives were, like, you had to pick somebody. I just wanted to go home and they were just, like, forcing me to pick somebody."

157.    After Chambers's recantation, prosecutors dropped the murder charges against Jenkins.

158.    In 1999, NYPD detectives investigating a deadly shooting conducted a lineup containing suspect Ronald Ambrose.

159.    Witness Edgar Rivera had, within an hour of the shooting, identified another man as the perpetrator.

160.    Rivera viewed the lineup containing Ambrose and did not identify Ambrose.

**161.**    Detective Jose Rosario then took Rivera into an office at the police precinct. Approximately 20 minutes later, Rosario and Rivera returned, and Rivera identified Ambrose as one of the shooters.

162.    After this identification, Ambrose was indicted for murder.

163.    Based on independent exculpatory evidence, Ambrose was acquitted at trial, but only after having served over two years in pretrial detention.

164.    During all relevant times, it was the established procedure and practice of the NYPD for detectives to ask eyewitnesses, after they had viewed of lineups, to review and sign "Line-Up

Report" forms in which the lineup participants were listed and the police suspect was identified as the "suspect" or "subject."

165.    This practice caused eyewitnesses—such as Ernest Brown in the present case and the witnesses discussed in the cases below—to learn that the person they had selected in the lineup was the police suspect and therefore to become more certain and later to testify much more strongly about their identifications at hearings or trials.

166.    In 1994, NYPD detectives investigating a murder in Queens put Jaythan Kendrick in a lineup and showed the lineup to 10-year-old witness Brandon Rogers.

167.    Rogers selected a filler, number six.

168.    Detectives had Rogers review and sign a Line-Up Report that identified number three, Kendrick, as the police "Subject."

169.    Detectives then took Rogers and Rogers's mother into a private room, where Rogers heard a detective say that Rogers had selected the wrong person.

170.    Rogers, having learned that number three, Kendrick, was the police suspect, now told the detectives that number three was his "second choice."

171.    Rogers testified to this manufactured identification of Kendrick at trial, and Kendrick was convicted and spent almost 25 years in prison before forensic evidence that exculpated Kendrick came to light and his conviction was vacated and the indictment dismissed.

172.    The NYPD was still following the highly suggestive practice of allowing witnesses to learn the police suspect's identity by reviewing Line-Up Sheets as late as 2005.

173.    That year, Detective Robert Moscoso presented a lineup containing Julio Negron to an eyewitness to a Queens shooting.

174. The eyewitness made an equivocal statement about whether he recognized Negron as the shooter.

175. Moscoso then manufactured the witness's positive identification of Negron by showing the witness a Line-Up Report that identified Negron, in capital letters, as the police "SUSPECT," and taking the witness into a private room and speaking to him for at least 15 minutes. Negron spent nearly 10 years in prison before the New York Court of Appeals reversed his conviction.

176. In 2009, Ricardo Benitez, a parolee, was arrested on suspicion of robbing a Radio Shack store in Queens.

177. NYPD officers Raul Lopez and Frank Libretto deliberately prepared a highly suggestive lineup to ensure that Benitez was identified: Benitez appeared to be 15 to 20 years older than the fillers in the lineup, had much darker skin, was noticeably thinner, and was sickly-looking, unshaven, and disheveled, whereas the fillers all were hale and clean-cut police officers.

178. A Queens ADA, Tina Grillo, who was present to supervise the lineup, told Detectives Lopez and Libretto that the lineup was improperly suggestive but then acquiesced in the procedure when they refused to select new fillers.

179. Based on the resulting identification, a grand jury, which was not informed of the suggestiveness of the lineup, indicted Benitez.

180. Benitez was convicted and spent almost six years in prison before his conviction was reversed and he was acquitted on retrial.

181. Evidence from more recent years shows that the NYPD's deliberate indifference to constitutional violations by police officers persists.[2]

---

[2] Post-incident evidence is relevant to a claim of municipal liability as it may "shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right." *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989); *see also Henry v. Cty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) ("[W]e reiterate our

182.     In 2014, a court dismissed attempted murder charges against Tyrone Brown after an eyewitness who had viewed a lineup revealed that she had first picked out a filler, but then, after one of the NYPD detectives conducting the lineup sighed and told her to take her time, changed her answer and picked the defendant, which elicited a nod from the two detectives in the room.

183.     The witness revealed that, in fact, she still believed that the original person she picked was the shooter.

184.     The problem of "testilying" documented by the Mollen Commission Report has also been permitted, during the ensuing years, to continue to fester, as the *New York Times* recently documented.[3]

185.     The *Times* reported that there were "more than 25 occasions since January 2015" in which "judges or prosecutors determined that a key aspect of a New York City police officer's testimony was probably untrue." The article noted that these cases represented "almost certainly only a fraction" of the actual instances of testilying, since "a vast majority of cases end in plea deals before an officer is ever required to take the witness stand."

186.     In a follow-up article, the *Times* reported that, out of 81 cases in which the Civilian Complaint Review Board ("CCRB") had found that an NYPD officer had made a false statement and the NYPD had reported some response to the finding, NYPD policymaking officials had disciplined officers in only two of the cases.[4]

---

rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry.").

[3] *See* Joseph Goldstein, *'Testilying' by Police: A Stubborn Problem*, N.Y. Times, Mar. 18, 2018, https://www.nytimes.com/2018/03/18/nyregion/testilying-police-perjury-new-york.html.

[4] *See* Joseph Goldstein, *Promotions, Not Punishments, for Officers Accused of Lying*, N.Y. Times, Mar. 19, 2018, https://www.nytimes.com/2018/03/19/nyregion/new-york-police-perjury-promotions.html.

187.    The CCRB told the reporter that, in addition to these 81 cases, the CCRB had made findings of false statements in "dozens of other" cases, but the NYPD never even responded to these findings.

188.    In 2018, *BuzzFeed* reported that it had obtained NYPD files revealing that "from 2011 to 2015 at least 319 New York Police Department employees who committed offenses serious enough to merit firing were allowed to keep their jobs."[5]

189.    At least 50 of these instances of misconduct involved officers making misleading or "inaccurate" statements in official records or to grand juries, district attorneys, or internal affairs investigators.

190.    In every instance, NYPD policymaking officials who had "final authority in disciplinary decisions, assigned these officers to 'dismissal probation,' a penalty with few practical consequences."

191.    Based on the above, NYPD policymaking officials knew or should have known, at the time of Plaintiff's prosecution, that NYPD employees, including Defendant Smith, were, among other things, manufacturing false or unreliable identification evidence, witness statements, or other evidence; initiating or continuing the prosecutions of criminal suspects despite lacking legitimate probable cause to believe such prosecutions would result in convictions; withholding or destroying material exculpatory or impeaching evidence under *Brady* and *Giglio*; and knowingly giving false or misleading testimony.

---

[5] Kendall Taggart & Mike Hayes, *Secret NYPD Files: Officers Who Lie And Brutally Beat People Can Keep Their Jobs*, BuzzFeed, Mar. 5, 2018, https://www.buzzfeednews.com/article/kendalltaggart/secret-nypd-files-hundreds-of-officers-committed-serious.

192. With deliberate indifference to such misconduct, NYPD policymaking officials failed to take adequate steps to train, supervise, or discipline NYPD employees to prevent or deter such constitutional violations from occurring.

193. This policy of deliberate indifference directly, foreseeably, proximately, and substantially caused the violations of Plaintiff's federal constitutional rights in this case and his resulting injuries.

194. By virtue of the foregoing, Defendant City of New York is liable for the violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983 and Plaintiff's resultant injuries.

**FIFTH CAUSE OF ACTION**: Violations of Rights Under New York City Administrative Code § 8-802. All Defendants.

Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

Pursuant to § 8-803 of the New York City Administrative Code, the Individual Defendants and their employer, the City of New York, are liable for their aforementioned violations of Mr. Mayo's rights, for his actual damages, and for punitive damages.

## <u>DEMAND FOR DAMAGES</u>

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

    a. compensatory damages for loss of liberty, past and future mental and emotional distress, and economic harm of not less than $23,000,000.00 (Twenty Three Million Dollars)

    b. reasonable attorneys' fees, together with costs and disbursements, under 42 U.S.C. § 1988, NY.C. Admin. Code § 8-805, and the inherent powers of this Court;

c.  pre-judgment interest as allowed by law; and

d.  such other and further relief as this Court may deem just and proper.

/s/ Ronald L. Kuby
RONALD L. KUBY
RHIYA S. TRIVEDI
Law Office of Ronald L. Kuby
119 West 23rd Street, Suite 900
New York, NY 10011
(212) 529-0223
ronaldlkuby@gmail.com
*Attorneys for Plaintiff*

Dated: New York, New York
        September 13, 2024